UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MELISSA A. HILLIARD,                              :

                Plaintiff,               :               13 Civ. 1942 (AJP)

            -against-                    :               **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of               :
Social Security,
                              :
            Defendant.
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

Plaintiff Melissa A. Hilliard, represented by counsel, brings this action pursuant to
§ 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the
Commissioner of Social Security (the "Commissioner") denying her Disability Insurance Benefits
("DIB") and Supplemental Security Income ("SSI") benefits. (Dkt. No. 1: Compl.) Presently before
the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P.
12(c). (Dkt. Nos. 8 & 11: Notices of Motion.) The parties have consented to decision by a
Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 5: Consent Form.)

For the reasons set forth below, the Commissioner's motion for judgment on the
pleadings (Dkt. No. 8) is <u>GRANTED</u> and Hilliard's motion (Dkt. No. 11) is <u>DENIED</u>.

## FACTS

### Procedural Background

On August 13, 2010, Hilliard applied for DIB benefits, alleging that she was disabled
since March 15, 2010. (Dkt. No. 7: Administrative Record filed by the Comm'r ("R.") 99.) On
December 21, 2010, Hilliard filed an application for SSI benefits. (R. 108.) Hilliard alleged

disability due to pain in the back, hips, right knee and right shoulder. (R. 152, 154, 192.) The Social Security Administration ("SSA") consolidated the applications, found that Hilliard was not disabled, and denied the applications. (R. 55-59.) On December 21, 2010, Hilliard requested an administrative hearing. (R. 61-64.)

Administrative Law Judge ("ALJ") Brian W. Lemoine conducted a hearing on December 12, 2011 (R. 25-47), at which Hilliard appeared with counsel (R. 25, 28-29). On December 15, 2011, ALJ Lemoine issued a written decision finding Hilliard not disabled. (R. 9-20.) ALJ Lemoine's decision became the Commissioner's final decision when the Appeals Council denied Hilliard's request for review on February 7, 2013. (R. 1-5, 195-200.)

The issue before the Court is whether the Commissioner's decision finding Hilliard not disabled is supported by substantial evidence.

## Non-Medical Evidence

Hilliard, born on December 25, 1965, was forty-four years old at the alleged onset of her disability. (R. 99, 108.) Hilliard graduated from high school and received some college credits. (R. 30.) Hilliard worked as a home health aide and as a van driver; both jobs required her to lift people and things. (R. 30-31, 132-33, 139-43.) Hilliard lives in Yonkers with the her three children, ages eighteen (twins) and twenty-one. (R. 39-40.) Hilliard performs light household chores, including washing the dishes, doing laundry, and cooking meals. (R. 39, 148, 275.) Hilliard's mother and three children help out with grocery shopping and other chores around the house, such as cooking and cleaning. (R. 39-40, 147-48, 275.) Hilliard takes public transportation by herself, but reported that she has difficulty going up the bus steps. (R. 41-42.) Hilliard leaves her house three to four times per week. (R. 147.) She is capable of walking and driving. (R. 147.)

Hilliard's activities include talking on the phone, watching television, reading, and walking locally. (R. 151, 275.)

## Medical Evidence

### Prior to March 15, 2010

On May 17, 2008, Hilliard was treated in the Emergency Department of St. John's Riverside Hospital for complaints of pain in her lower back and right hip, the latter of which radiated down to her right leg. (R. 222-35.) An x-ray of the right hip and pelvis area came back normal. (R. 229.) The right knee x-ray revealed mild degenerative joint disease. (R. 228.) The hospital wanted to admit Hilliard for further evaluation of an unrelated condition, but Hilliard refused and was discharged against medical advice. (R. 226.) Upon discharge, Hilliard was ambulatory with steady gait. (R. 224.)

On May 5, 2009, Hilliard went to the Emergency Department at St. John's Riverside Hospital after a motor vehicle accident. (R. 236-41.) Hilliard was driving her work vehicle when she was hit from the side and injured her left knee. (R. 236.) A left knee x-ray could not rule out a small effusion. (R. 240.) Hilliard's knee was sore, but she could bear weight and walk. (R. 239.)

On October 4, 2009, Hilliard visited the Emergency Department at St. John's Riverside Hospital after tripping and falling the prior day. (R. 242-47.) Hilliard complained of pain in her back and wrist. (R. 242.) An x-ray of the lumbar spine showed no evidence of fracture and no abnormalities. (R. 246.) Hilliard was discharged that same day. (R. 244-45.)

On October 13, 2009, Hilliard returned to the Emergency Department at St. John's Riverside Hospital complaining of back pain on her right side, leg pain, bilateral knee pain, and numbness to her toes on her right foot. (R. 248-54.) Hilliard stated that the pain has been constant since her fall the previous week. (R. 248.) X-rays of both knees were normal. (R. 250.) An x-ray

of the right wrist showed "mild degenerative changes of the carpal bones." (R. 250.) The attending physician diagnosed knee contusion, acute sprain/strain of the rotator cuff and arm contusion. (R. 254.)

On December 17, 2009, Hilliard visited her primary care physician, Dr. Lee Berk, complaining of right knee pain with popping and clicking. (R. 479-82.) Hilliard stated that the symptoms began four weeks prior. (R. 479.) She also complained of swelling and pain in her right calf. (R. 479.) Dr. Berk's physical examination showed moderate warmth and tenderness at the right knee along the joint line with suggestion of small effusion. (R. 480.) Dr. Berk also noted tenderness at the right calf. (R. 480.) Dr. Berk ordered a Duplex Doppler study of the lower right leg to evaluate Hilliard's calf swelling and right leg pain. (R. 481.) The Duplex Doppler test was performed on January 2, 2010 and revealed no evidence of deep venous thrombosis. (R. 336.)

Hilliard's persistent knee pain was unresponsive to physical therapy and Dr. Berk diagnosed a right meniscal tear. (R. 310.) On March 5, 2010, Dr. Berk cleared Hilliard for arthroscopic surgery on the right knee. (R. 310-13.) Dr. Arnold Wilson performed the surgery on March 15, 2010. (R. 201, 217, 298.)

**After March 15, 2010**

**April 1, 2010 Through August 31, 2010**

On May 7, 2010, Hilliard saw Dr. Berk with complaints of radiating pain in her neck, which began a year earlier and had since worsened. (R. 302.) Hilliard also complained of persistent right thigh and knee pain. (R. 302.) Hilliard had reduced her physical therapy treatment to once a week. (R. 302.) Dr. Berk noted that Hilliard was "currently out of work for unspecified reasons, and it is unclear if there are other [u]lterior motives to document disabilities, as [Hilliard] is not anxious to return to work. [Hilliard] appears to be lackadaisical about pursuing PT." (R. 302.) On

the same visit, Dr. Berk observed that Hilliard had localized tenderness on palpation of the right trapezius and paracervical muscles. (R. 304.) Hilliard had right shoulder pain on full abduction and external rotation and tenderness of the great trochanter extending down the iliotibial band and right knee. (R. 304.) Dr. Berk diagnosed right shoulder impingement syndrome and iliotibial band syndrome in the right knee. (R. 304.) Dr. Berk's assessment was that both conditions had deteriorated and that Hilliard should follow up with Dr. Wilson for further evaluation and treatment. (R. 304.)

On May 21, 2010, in a Supplementary Report questionnaire for Hilliard's insurance company, Dr. Berk listed the following diagnoses: right trochanteric bursitis since February 2005; lumbar radiculopathy, October 2005; cervical spondylosis and iliopsosis tendinitis, September 2006. (R. 296.) Dr. Berk opined that Hilliard was disabled and that it was unknown when she would be able to return to work. (R. 296.) Dr. Berk also filled out a New York State Department of Motor Vehicles Application for a Parking Permit for persons with disabilities for Hilliard, indicating that Hilliard had a temporary disability due to a meniscal tear in her right knee with an expected recovery date of September 15, 2010. (R. 297.)

On June 21, 2010, Hilliard visited Dr. Berk complaining of light-headedness. (R. 212.) Dr. Berk's musculoskeletal findings indicated that Hilliard had the normal full range of motion of all joints with no clubbing, cyanosis, edema, or deformity noted. (R. 214.) Dr. Berk diagnosed unchanged lumbar strain and soft cervical radiculopathy, and ordered Hilliard to continue with physical therapy. (R. 214.)

On June 30, 2010, Dr. Berk filled out a Workers' Compensation Board Doctor's Progress Report for Hilliard, listing the following diagnoses: meniscal tear and shoulder impingement. (R. 202.) Dr. Berk indicated that he referred Hilliard for orthopedic evaluation with

Dr. Arnold Wilson for complaints related to her knee and back pain. (R. 203.) Dr. Berk determined there was an eighty-percent temporary impairment. (R. 203.) Dr. Berk further concluded that Hilliard could not return to work due to her inability to sit for more than two hours, stand for more than thirty minutes, bend, lift, pull or twist. (R. 203.)

On July 2, 2010, Hilliard went to the Emergency Department at St. John's Riverside Hospital complaining of right shoulder pain. (R. 258-62.) The nursing assessment found Hilliard's range of motion to be intact to the affected area but she was unable to lift her right arm over her head. (R. 259.) The attending physician noted that Hilliard was able to lift her arm over her head, but that she had decreased range when putting her arm behind her back. (R. 261.) Hilliard expressed tenderness throughout her entire right shoulder and had spasms in the posterior aspect of the shoulder. (R. 261.) The attending physician ordered an x-ray, but Hilliard refused, demanding an MRI instead. (R. 259, 261.) The doctor explained that Hilliard would not be able to get an MRI on that same day and she would have to get it done as an outpatient. (R. 259.) The attending physician diagnosed acute sprain/strain in her arm, clavicle, and shoulder. (R. 261.)

On July 15, 2010, an MRI of Hilliard's right shoulder showed mild tendinosis of the supraspinatus and infraspinatus tendons without tear, and mild arthrosis of the AC joint. (R. 204.)

On July 23, 2010, Dr. Wilson filled out an insurance Supplementary Report indicating that Hilliard was disabled with an undetermined return to work date. (R. 201.) On August 26, 2010, Dr. Wilson reported in the post-operative knee evaluation form that Hilliard's recovery was normal and her range of motion was acceptable. (R. 217.) Additionally, Dr. Wilson indicated that Hilliard's wound was healed and that she ambulated with a cane. (R. 217.) Dr. Wilson recommened that Hilliard continue out-patient rehabilitation. (R. 217.)

## September 1, 2010 Through December 31, 2010

On November 2, 2010, Hilliard visited Dr. Berk complaining of pain in her right shoulder, neck, and back. (R. 435-39.) Dr. Berk's physical examination showed that Hilliard was experiencing neck spasms and tenderness in her right trapezius and paracervical muscles. (R. 437.) Both straight leg raise tests proved negative. (R. 437.) Hilliard had tenderness of the right acromioclavicular joint and rotator cuff, a condition which worsened with abduction and rotation of the shoulder, and mild neurologic weakness of the right arm and hand caused by pain. (R. 437.) Dr. Berk diagnosed right shoulder impingement syndrome, right cervical radiculopathy, and myofascial pain syndrome. (R. 437-38.) Dr. Berk referred Hilliard to a surgeon to assess the need for surgical intervention for her right shoulder. (R. 438.) Hilliard also was referred for physical therapy evaluation for her neck and myofascial pain. (R. 437-38.) Dr. Berk encouraged Hilliard to lose weight and to exercise. (R. 439.)

On November 10, 2010, Hilliard was seen by consultative orthopedic surgeon Dr. Suraj Malhotra, to whom she was referred by the Division of Disability Determination. (R. 274-77.) Hilliard stated that since an automobile accident a few years earlier, she had experienced chronic neck pain, intermittent and non-radiating, with no accompanying tingling or numbness. (R. 274.) Hilliard further alleged that she felt pain in her right shoulder in the year after the accident, pain in her lower back for the previous two years, and pain in her right shoulder since her slip and fall in October 2009. (R. 274.) The pain in her lower back was intermittent and radiates to the legs. (R. 274.) Hilliard told Dr. Malhotra that she previously worked as a bus driver but stopped on May 20, 2010 due to back pain. (R. 274.) Hilliard stated that she uses a cane to minimize the leg pain. (R. 274.) Hilliard reported that she cannot stand for too long, but she cooks and cleans three or four times a week and sometimes does the laundry and goes shopping. (R. 275.)

Dr. Malhotra reported that Hilliard was "somewhat sluggish and moderately obese." (R. 275.) Hilliard appeared to be in no acute distress and walked with a normal gait. (R. 275.) Due to back discomfort, Hilliard could squat only halfway down. (R. 275.) Dr. Malhotra was uncertain whether the cane Hilliard used was medically necessary because it was not used consistently during the examination. (R. 275-76.) Hilliard needed no help changing for the exam or getting on and off the examination table. (R. 275.) Dr. Malhotra diagnosed obesity, hypertension, cervical spine spondylosis with pain, a tear of the right rotator cuff with pain, and lumbosacral intervertebral disk herniation with pain. (R. 276-77.) Dr. Malhotra indicated that Hilliard's prognosis was good and that "[t]here is a mild limitation in bending, moderate limitation in squatting, and moderate limitation in elevating right arm above the shoulder level." (R. 277.)

On November 30, 2010, Hilliard complained to Dr. Berk of pain in the left arm, having previously been seen by the Emergency Department of St. Joseph's Medical Center. (R. 425.) Hilliard stated that the attending physician advised her that the pain was a result of a shoulder spur, and she was given an injection and a prescription for analgesics. (R. 425.) Upon examination, Hilliard reported pain during abduction and rotation of both shoulders. (R. 427.) She had localized tenderness of the left AC joint and rotator cuff. (R. 427.) Hilliard also felt pain with internal and external rotation of the left hip. (R. 427.) Straight leg raising was negative on the left side. (R. 427.) Dr. Berk diagnosed left trochanteric bursitis and left shoulder impingement syndrome. (R. 427.) Dr. Berk ordered x-rays of the left hip and left shoulder, and referred Hilliard to physical therapy for a pain management assessment. (R. 427.) Hip x-rays were performed the same day and showed mild degenerative changes bilaterally. (R. 422.)

**2011**

On January 15, 2011, an MRI of Hilliard's right shoulder revealed edema and mild tendinosis of the superior rotator cuff, mild bursitis, and fluid surrounding the biceps tendon. (R. 401.) Five days later, Dr. Berk notified Hilliard that her MRI confirmed the presence of rotator cuff and biceps tendinitis and shoulder bursitis. (R. 400.)

On May 4, 2011, Hilliard visited Dr. Berk complaining of diffuse myalgias. (R. 383-87.) Physical examination showed that Hilliard could not raise her leg while keeping it straight. (R. 385.) Additionally, Hilliard experienced pain in both shoulders with abduction and internal/external rotation. (R. 385.) There was no clubbing, cyanosis, edema, or deformity noted in the extremities with full range of motion. (R. 386.) Dr. Berk diagnosed acute costochondritis, right shoulder impingement syndrome, hypertension, arthritis, and knee pain. (R. 386.) He also diagnosed left shoulder impingement syndrome, but assessed that it had improved. (R. 386.)

On May 6, 2011, Dr. Berk filled out a New York State Department of Labor form in which he indicated that Hilliard would be able to resume work on May 9, 2011. (R. 381-82.) He also opined that Hilliard was able to lift, carry, push, and pull up to ten pounds, stand for up to two consecutive hours, and sit for up to six consecutive hours. (R. 381.) Dr. Berk stated that Hilliard should avoid climbing, stooping, and bending, but that there was no limitation on her ability to take public transportation. (R. 381.) He indicated that Hilliard's work shift should be limited to eight hours per day. (R. 381.) Dr. Berk stated that he did not advise Hilliard that it was medically necessary to quit her last job. (R. 382.)

On June 21, 2011, Hilliard saw Dr. Berk for ongoing joint pains, especially in her right shoulder. (R. 362.) Both straight leg raise tests were negative. (R. 364.) Hilliard had pain when both shoulders were abducted and externally rotated, but pain was greater in the right than the

left. (R. 364.) She also had tenderness in her ankles and the superior aspect of her right patella. (R. 364.) There was no clubbing, cyanosis, edema, or deformity of her extremities noted with full range of motion. (R. 364.) Dr. Berk diagnosed Hiliard with improved right cervical radiculopathy, and hypertension, unchanged right shoulder impingement syndrome and arthritis. (R. 364-65.)

On July 16, 2011, a CT scan was performed on Hilliard's lumbar spine. (R. 454.) The results showed at L2-L3 level, mild disc bulge without gross impingement; at L3-L4 level, that there may be minimal left latoral disc bulge; and at L4-L5 level, mild central and loft paracentral disc bulge without gross nerve root impingement. (R. 454.) The impression was that there was a possible left adrenal adenoma. (R. 454.)

On November 16, 2011, an MRI of Hilliard's lumbar spine revealed mild L5-S1 degenerative disc space narrowing and a very small slightly right paramedian L3-L4 disc herniation. (R. 527.)

On December 6, 2011, Dr. Berk completed a Physical Residual Functional Capacity Questionnaire for Hilliard. (R. 529-33.) His diagnoses included hypertension, lumbosacral spasm, shoulder impingement, trochanteric bursitis, meniscal tear, right cervical radiculopathy, iliotibial band (ITB) of the right knee, and myofascial pain syndrome. (R. 529.) Dr. Berk stated that Hilliard had neck pain on her right side, with shoulder and arm pain and numbness. (R. 529.) Hilliard also had mild knee pain, and pain radiating from her back into her legs, in both cases worse on the right side than the left. (R. 529.) He further stated that "pain is present in all daily activities, involving all the [previously listed] areas, and is worsened by lifting, bending, twisting, [and] walking." (R. 529.) Dr. Berk's clinical findings were limited abduction in the neck and in the right shoulder more than the left, and a positive straight-leg raising test at sixty degrees for both legs. (R. 529.) Dr. Berk also indicated that Hilliard was unresponsive to physical therapy and injections. (R. 529.)

Dr. Berk did not find Hilliard to be a malingerer, and he considered Hilliard's impairments to be reasonably consistent with the symptoms and functional limitations described in his evaluation. (R. 530.) He estimated that during a typical workday Hilliard's experience of pain was severe enough to constantly "interfere with attention and concentration needed to perform even simple work tasks." (R. 530.) Dr. Berk also indicated that Hilliard was capable of handling "low stress jobs," but that there are extreme physical limitations. (R. 530.) Dr. Berk estimated that Hilliard could walk a half block without rest or severe pain, sit for only fifteen minutes at a time, and stand for twenty minutes at a time due to pain in her back and knees. (R. 530.) In an eight-hour working day Hilliard would be able to sit or stand/walk for less than two hours. (R. 531.) In addition, Hilliard would need to take six walking breaks of five minutes each during an eight-hour working day. (R. 531.) Dr. Berk also found that Hilliard would need to take four or five unscheduled twenty minute breaks. (R. 531.) He stated that Hilliard could rarely lift or carry up to ten pounds, look up, stoop (bend), squat, and climb stairs. (R. 531-32.) Dr. Berk also indicated that Hilliard had significant limitations in the right hand with reaching, handling, or fingering. (R. 532.) Dr. Berk believed that Hilliard's impairment would produce good and bad days and she would be absent from work more than four days a month. (R. 532.)

## ALJ Lemoine's Decision

On December 15, 2011, ALJ Lemoine issued a written decision denying Hilliard's application for DIB and SSI benefits. (R. 9-24.)

ALJ Lemoine conducted a five-step analysis, considering both Hilliard's testimony and the medical record. (R. 14-20.) First, ALJ Lemoine found that Hilliard had not engaged in substantial gainful activity since March 15, 2010, the alleged onset date. (R. 16.) Second, ALJ Lemoine determined that Hilliard had the following severe impairments: bilateral knee pain, status-

post right knee arthroscopy, right shoulder impingement, degenerative disc disease of the cervical and lumbar spine, obesity, and mild ostearthritis of the bilateral hips. (R. 16.) Third, ALJ Lemoine determined that Hilliard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed impairments. (R. 16-17.)

ALJ Lemoine determined that Hilliard retained the residual functional capacity to perform a range of sedentary work that did not require more than occasional overhead reaching with the dominant right upper extremity. (R. 17.) ALJ Lemoine found that Hilliard is able to lift/carry up to ten pounds, sit for a total of six hours, and stand and walk for two hours in an eight-hour workday. (R. 17.) ALJ Lemoine considered Hilliard's subjective allegations and testimony, but did not "find them to be totally credible for several reasons." (R. 17.) ALJ Lemoine found that "the level of medical treatment documented to date is not commensurate with [Hilliard's] pain allegations." (R. 17.) ALJ Lemoine determined that "the evidence reflects that [Hilliard] has remained quite functional in terms of her activities of daily living." (R. 18.)

ALJ Lemoine did not give significant credence to Dr. Berk's latest assessment finding it "inconsistent with the objective medical documentation of record, and it seems to be primarily based upon the claimant's subjective pain complaints." (R. 18.) ALJ Lemoine also noted that Dr. Berk had raised the question of Hilliard's possible ulterior motives and lack of employment motivation. (R. 18.) In addition, ALJ Lemoine found Dr. Malhotra's impressions to be persuasive and generally consistent with the medical records. (R. 18.)

At the fourth step, ALJ Lemoine determined that Hilliard was "unable to perform any past relevant work," since that work was at the medium exertional limitation level. (R. 19.) At the last step, AJL Lemoine found that Hilliard was "44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. [Hilliard] subsequently changed age

category to a younger individual age 45-49"; Hilliard had "a high school education and is able to communicate in English"; and "[t]ransferability of job skills is not material to the determination of disability." (R. 19.) ALJ Lemoine found that, "[c]onsidering [Hilliard's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform." (R. 19.) ALJ Lemoine applied the corresponding Medical-Vocational Rules 201.21 and 201.28 for those capable of performing sedentary work, and explained that "considering [Hilliard's] age, education, and work experience, a finding of 'not disabled' would be directed by Medical-Vocational Rule[s]." (R. 19.) ALJ Lemoine concluded that Hilliard was not "under a disability, as defined in the Social Security Act, from March 15, 2010, through the date of [the] decision," December 15, 2011. (R. 20.)

On February 7, 2013, the Appeals Council denied Hilliard's request for review of ALJ Lemoine's decision and it became the Commissioner's final decision. (R. 1-6.)

## ANALYSIS

## I.     THE APPLICABLE LAW

### A.     Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856,

857 (2d Cir. 2012).[1]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23,

124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of

Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v.

Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[2]

    In determining whether an individual is disabled for disability benefit purposes, the

Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions

based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

---

[1]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[2]   See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

others; and (4) the claimant's educational background, age, and work experience." Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[3/]

## B. Standard Of Review

A court's review of the Commissioner's final decision is limited to determining

whether there is "substantial evidence" in the record as a whole to support such determination. E.g.,

42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-

Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[4/] "'Thus, the role of the district court is

quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v.

Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[5/]

---

[3/]   See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[4/]   See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[5/]   See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[6/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[7/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

---

[6/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[7/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g.,

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

Apfel, 167 F.3d at 774.[8/]

        The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[8/]    See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training. See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[9]

C.     **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity
> of your impairment(s) is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010);

Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361,

362 (2d Cir. 2006).[10]

Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

---

[9]     See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F.
App'x at 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v.
Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at
467.

[10]    See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v.
Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308
(2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v.
Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5
(2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec.
Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.
2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec.,
143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2)-(6); <u>see</u>, <u>e.g.</u>, <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010); <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x at 346-47; <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d at 32; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 134; <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d at 118; <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d at 503.[11]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician

---

[11]    <u>See also</u>, <u>e.g.</u>, <u>Kugielska</u> v. <u>Astrue</u>, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); <u>Hill</u> v. <u>Barnhart</u>, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); <u>Klett</u> v. <u>Barnhart</u>, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); <u>Rebull</u> v. <u>Massanari</u>, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II. APPLICATION OF THE FIVE-STEP SEQUENCE TO HILLIARD'S CLAIM

### A. Hilliard Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Hilliard was engaged in substantial gainful activity after her application for SSI benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Lemoine's conclusion that Hilliard did not engage in substantial gainful activity during the applicable time period (see page 11 above) is not contested by the parties. (See generally Dkt. No. 9: Comm'r Br.; Dkt. No. 12: Hilliard Br.) The Court therefore proceeds to the second step of the five-step analysis.

### B. Hilliard Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Hilliard proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[12/]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

---

[12/]    Accord, e.g., Whiting v. Astrue, Civ. Action No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.' Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

ALJ Lemoine determined that the medical evidence indicated that Hilliard's impairments of "bilateral knee pain, status-post right knee arthroscopy, right shoulder impingement, degenerative disc disease of the cervical and lumbar spine, obesity, and mild osteoarthritis of the bilateral hips" were severe. (See pages 11-12 above.) These findings benefit Hilliard and are not disputed. (See generally Dkt. No. 9: Comm'r Br.) The Court therefore proceeds to the third step of the five-part analysis.

### C.     Hilliard Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Hilliard had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Lemoine found that Hilliard's impairments did not meet or equal the severity of any of the listed impairments. (R. 16-17.) Specifically, ALJ Lemoine found that "there is no documentation of an inability to ambulate or to perform fine/gross manipulations effectively within the context of medical listing 1.02A/B." (R. 17.) In addition, ALJ Lemoine noted that there is "no indication of significant motor, sensory, or reflex deficits as required under medical listing 1.04A." (R. 17.)

ALJ Lemoine's conclusion that Hilliard did not have a listed impairment is supported by substantial evidence and is not disputed by the parties. For example, with respect to Hilliard's knee pain, Section 1.02 outlines the conditions required to establish disorders of the joint. 20

C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. To constitute an Appendix 1 listed impairment, Hilliard's right knee pain must qualify as "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), <u>resulting in inability to ambulate effectively</u>, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added).

> Under Section 1.03, impairment can also arise from:
>
> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with <u>inability to ambulate effectively</u>, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.03 (emphasis added).

> "Inability [t]o ambulate effectively" means:
>
> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). "To ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

As to Hilliard's knee, the evidence clearly showed that she could ambulate effectively—she used only one cane (not two), and Dr. Malhotra questioned whether her use of the case was medically necessary. (See pages 7-8 above.)

Because the finding that Hilliard's impairments do not meet or medically equal the listed conditions is not disputed by the parties (see generally Dkt. No. 9: Comm'r Br. at 14, 17; Dkt. No. 12: Hilliard Br.), the Court proceeds with the five-step analysis.

Before proceeding to step four, the Court will address ALJ Lemoine's credibility and residual functional capacity determinations.

### 1.    Credibility Determination

Because subjective symptoms like pain only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the

credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[13] In addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[14]

ALJ Lemoine "considered all [Hilliard's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other

---

[13]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine."); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record.); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[14]    Accord, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

evidence," and determined that Hilliard's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible." (R. 17-18.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96–7p, 1996 WL 374186 at *4 (July 2, 1996). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.... If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quotations, citations & brackets omitted).[15]

ALJ Lemoine properly applied this two-step process to Hilliard's case. (R. 17-18.) ALJ Lemoine assessed Hilliard's credibility by considering all of the relevant medical evidence in the record. (R. 17.) First, ALJ Lemoine determined that "the level of medical treatment documented to date is not commensurate with the claimant's pain allegations." (R. 17.) Besides Hilliard's right knee meniscal tear diagnosis and the subsequent arthroscopic surgery, all other examinations and treatments were conservative in nature and showed that Hilliard's alleged

---

[15]     Accord, e.g., Cichocki v. Astrue, No. 12-3343-cv, --- F. App'x ----, 2013 WL 4750284 at *3 (2d Cir. Sept. 5, 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

conditions were mild. (R. 17.) In addition, as ALJ Lemoine pointed out, the "[r]adiographic studies (x-rays, CT scans, and MRI studies) have consistently chronicled slight/mild clinical orthopedic findings." (R. 17.) Regarding Hilliard's shoulder pain, Dr. Berk diagnosed her with right shoulder impingement syndrome and two subsequent MRI studies revealed mild tendinosis of the superior rotator cuff, mild arthrosis of the AC joint, and mild bursitis. (R. 204, 304, 401.) Regarding Hilliard's hip pain, x-rays revealed only mild degenerative changes bilaterally. (R. 422.) Moreover, both tests used to evaluate Hilliard's back pain, a CT scan and an MRI of the lumbar spine, showed mild or minimal disc bulges and mild L5-S1 degenerative disc space narrowing. (R. 454, 527.) Hilliard's medical records show that she has no abnormalities in terms of gait or station, and that she maintains intact neurological functioning. (R. 302, 362, 383, 427, 435, 448.) Therefore, ALJ Lemoine correctly concluded that "the objective medical evidence fails to corroborate contentions of total disability." (R. 18.) See, e.g., McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) ("'ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'"); Jones v. Comm'r of Soc. Sec., 12 Civ. 6164, 2013 WL 4482702 at *9 (S.D.N.Y. Aug. 22, 2013) (ALJ's finding that plaintiff was not disabled was supported by substantial evidence where, inter alia, "notwithstanding Plaintiff's complaints, his treatment was largely conservative and never required inpatient care").

   Second, ALJ Lemoine found that Hilliard "remained quite functional in terms of her activities of daily living." (R. 18.) ALJ Lemoine noted that Hilliard has been able to take care of herself in terms of showering, grooming, and dressing. (R. 18.) Hilliard testified that she is able to do light chores around the house, including washing dishes, doing laundry and cooking. (See

pages 2, 7 above.)  Hilliard also is able to take public transportation on her own and take walks. (See page 2 above.)

Thus, ALJ Lemoine met his burden in finding Hilliard's claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain.  See, e.g., Campbell v. Astrue, 465 F. App'x at 6 (ALJ does not have to reconcile every single piece of conflicting testimony); Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

## 2.    Residual Functional Capacity Determination

ALJ Lemoine determined that Hilliard retained "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a); [which] does not require greater than occassional overhead reaching with the dominant right upper extremity."  (R. 17.) Specifically, ALJ Lemoine concluded that Hilliard is able to (1) lift/carry up to ten pounds, and (2) stand and/or walk for a total of two hours and sit for a total of six hours during a typical eight-hour workday.  (R. 17.)

Hilliard contends that the ALJ violated the treating physician rule by failing to afford adequate weight to Dr. Berk's opinion. (Dkt. No. 12: Hilliard Br. at 11-17.) Even though "the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[16] Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[17] ALJ Lemoine found Dr. Berk's conclusion "inconsistent with the objective medical documentation of record, and . . . primarily based upon [Hilliard's] subjective pain complaints." (R. 18.) Although previous reports written by Dr. Berk indicated that it was unknown

---

[16]  Accord, e.g., Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of deference does not apply where 'the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as opinions of other medical experts.'").

[17]  See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.).

when Hilliard would be able to return to work, his May 6, 2011 report stated that Hilliard could resume work on May 9, 2011. (R. 203, 296, 381.) On that May 6, 2011 report, Dr. Berk concluded that Hilliard could lift up to ten pounds, stand for up to two consecutive hours, and sit for up to six consecutive hours. (R. 381.) Nothing in the medical records between that date and December 6, 2011 justifies Dr. Berk's subsequent report that Hilliard was limited in sitting and standing for less than two hours in an eight-hour workday. (R. 530; see pages 9-10 above.) Notably, other than some complaints of pain regarding ranges of motion, Dr. Berk did not report persistent muscle spasm, sensory deficit or motor disruption. (See pages 3-11 above.) The ALJ therefore appropriately relied on Dr. Berk's May 2011 rather than December 2011 conclusions, supported by the report of the consultative orthopedic surgeon Dr. Malhotra, and all the medical evidence in the record. (R. 18.) Dr. Malhotra's report indicated some limitation of bending, squatting, and overhead reaching but not any limitations as to Hilliard's abilities to sit, stand, walk, or lift up to ten pounds. (R. 274-77; see page 8 above.)

Accordingly, the Court finds ALJ Lemoine's assessment that Hilliard is able to perform sedentary work "that does not require greater than occasional overhead reaching with the dominant right upper extremity" was based on substantial evidence.

### D. Hilliard Did Not Have The Ability To Perform Her Past Work

The fourth step of the five-step analysis asks whether Hilliard had the residual functional capacity to perform her past relevant work. (See page 17 above.) Finding that Hilliard's previous positions as a para-transit shuttle bus driver and a home health aide (see page 2 above) "are generally performed at the medium exertional level," ALJ Lemoine concluded that Hilliard was "unable to perform any past relevant work." (See page 12 above.) Because this finding favors

Hilliard and is not contested by the Commissioner (see generally Dkt. No. 9: Comm'r Br.), the Court

proceeds to the fifth and final step of the analysis.

## E. There Was Sufficient Evidence To Support The ALJ's Finding That Hilliard Could Perform "Sedentary" Work In The Economy

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980).[18/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,
> Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account
> the claimant's residual functional capacity in conjunction with the claimant's age,
> education and work experience. Based on these factors, the Grid indicates whether
> the claimant can engage in any other substantial gainful work which exists in the
> national economy. Generally the result listed in the Grid is dispositive on the issue
> of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x

87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five

categories based on the exertional requirements of the different jobs. Specifically, it divides work

---

[18/]   See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc.
Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir.
2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d
117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567. Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(a).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert

(or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'"

(quoting & citing Bapp)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9

(E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the

range of work permitted by his exertional limitations,' the ALJ is required to consult with a

vocational expert." (quoting Zabala)).

ALJ Lemoine properly concluded that although Hilliard remains somewhat limited

in her upperbody movements, such "limitations have little or no effect on the occupational base of

unskilled sedentary work." (R. 19.) Using the Grid, ALJ Lemoine found that a person of Hilliard's

age (forty-five years old), education level (high school diploma), work experience, and ability to

perform sedentary work is not disabled for the purposes of Social Security benefits. (R. 19.)

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Hilliard was

not disabled within the meaning of the Social Security Act during the period March 5, 2010 to

December 15, 2011 is supported by substantial evidence. Accordingly, the Commissioner's motion

for judgment on the pleadings (Dkt. No. 8) is GRANTED and Hilliard's motion for judgment on the

pleadings (Dkt. No.11) is DENIED.

SO ORDERED

Dated:       New York, New York
             October 31, 2013

**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to: All Counsel